**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| *IN RE CALL-ON-DOC, INC. DATA BREACH LITIGATION* | Civil Action No. 3:26-CV-0200-S |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| This Document Relates To: ALL ACTIONS | **DEMAND FOR JURY TRIAL** |

Plaintiffs Armando Esquivel, David Freifeld, Richard Jones, Yusha TrueLove, Echo Wu, Dawn Garrigues, Brandy Zimmer, Adam Bettencourt, Armine Sarkissian, and John Sanders ("Plaintiffs") bring this Class Action Complaint ("Complaint") against Defendant Call-On-Doc, Inc. d/b/a Call-On-Doc.com ("Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions, and upon information and belief and investigation of counsel as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") entrusted to it by Plaintiffs and Class Members.

2. Defendant is an online telehealth provider that offers virtual medical consultations, prescriptions, and laboratory services to patients nationwide.[1]

[1] *Doctor In Your Pocket*, CALL-ON-DOC, https://www.callondoc.com/en/consultation?_gl=1*1b18gkf*_up*MQ..&gclid=Cj0KCQiA4eHLBhCzARIsAJ2NZoKcDWPpAiAIyOaRLPyzzbzMbnOCE9TInlNl6xXQlgMj92RJbEujbfAaAqCcEALw_wcB&gbraid=0AAAAADNDh2PHXKEusMI6YCZkOOLV4oksY (last visited Sept. 10, 2026).

3. To obtain services from Defendant, Plaintiffs and Class Members were required to entrust Defendant with sensitive, non-public Private Information. Defendant could not perform its regular business activities without this Private Information. Defendant retains this information for many years and even after the relationship has ended.

4. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5. On January 22, 2026, it was publicly reported that Defendant suffered a major security incident in which a threat actor exfiltrated over 1.1 million patient records in December 2025 and subsequently offered the database for sale on a dark web forum. Reports indicate that a threat actor using the name “iProfessor” claimed responsibility for the listing on a dark web forum.[2]

6. Upon information and belief, according to public reports concerning the content of the Private Information posted on the dark web forum, and due to the nature of the services Defendant provides, the Private Information compromised in the Data Breach includes, but is not limited to, patients’ names, contact information such as addresses, phone numbers, and email addresses, medical diagnoses, and prescription information.[3]

7. Defendant failed to adequately protect the Private Information of Plaintiffs and Class Members—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendant’s negligent and/or careless acts and omissions and its utter failure to protect Plaintiffs’ and Class Members’

---

[2] *CallOnDoc Suffers Breach According to Dark Web Reports*, UPGUARD (Jan. 26, 2026), https://www.upguard.com/news/callondoc-data-breach-2026-01-22 (last visited Sept. 10, 2026).
[3] *Id.*

sensitive data. Hackers targeted and obtained the Private Information because of its value in exploiting and stealing the identities of Class Members and to conduct financial crimes against Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

8. Upon information and belief, Plaintiffs' Private Information is available on the dark web as a result of the Data Breach.

9. In breaching its duties to properly safeguard Plaintiffs' and Class Members' Private Information, Defendant's conduct amounts to negligence and/or recklessness and violates federal and state statutes.

10. Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

11. Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and

Class Members have a continuing interest in ensuring that their Private Information is and remains safe, and they are entitled to injunctive and other equitable relief.

12. Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) Plaintiffs' Private Information being disseminated on the dark web; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

13. Plaintiffs and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

14. Plaintiff Armando Esquivel is a natural person and citizen of the State of Arizona, residing in Kingman, Arizona, where he intends to remain.

15. Plaintiff David Freifeld is a natural person and citizen of the State of Illinois, residing in Vernon Hills, Illinois, where he intends to remain.

16. Plaintiff Richard Jones is a natural person and citizen of the State of Idaho, residing in Star, Idaho, where he intends to remain.

17. Plaintiff Yusha TrueLove is a natural person and citizen of the State of California, residing in Mill Valley, California, where he intends to remain.

18. Plaintiff Echo Wu is a natural person and citizen of the State of Tennessee, residing in Medina, Tennessee, where she intends to remain.

19. Plaintiff Dawn Garrigues is a natural person and citizen of the State of California, residing in Silverado, California, where she intends to remain.

20. Plaintiff Brandy Zimmer is a natural person and citizen of the State of Texas, residing in Spring, Texas, where she intends to remain.

21. Plaintiff Adam Bettencourt is a natural person and citizen of the State of California, residing in Ontario, California.

22. Plaintiff Armine Sarkissian is a natural person and citizen of the State of California residing in Glendale, California, where she intends to remain.

23. Plaintiff John Sanders is a natural person and citizen of the State of Colorado, residing in Grand Junction, Colorado, where he intends to remain.

24. Defendant Call-On-Doc, Inc. d/b/a Call-On-Doc.com is a corporation organized under the laws of the State of Texas, maintaining its principal place of business at 8355 Walnut Hill Lane, Dallas, Texas 75231.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. Plaintiffs Esquivel, Freifeld, Jones, TrueLove, Wu, Garrigues, Zimmer, Bettencourt, Sarkissian,

and Sanders are citizens of Arizona, Illinois, Idaho, Colorado, California, Tennessee, and Texas, respectively, and Defendant is a citizen of Texas.

26. This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly conducts business in this District, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

27. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL BACKGROUND

### A. *Defendant's Business*

28. Defendant is an online telehealth provider that offers virtual medical consultations, prescriptions, and laboratory services to patients nationwide, including to patients in this District and throughout the United States.

29. Plaintiffs and Class Members were required to entrust Defendant with sensitive, non-public Private Information as a condition of receiving services from Defendant.

30. The information held by Defendant in its computer systems at the time of the Data Breach included unencrypted Private Information that Plaintiffs and Class Members provided to Defendant.

31. Upon information and belief, and through its privacy policy ("Privacy Policy"),[4] Defendant made promises and representations to Plaintiffs and Class Members that the Private

[4] *Online Privacy Policy*, CALL-ON-DOC (last visited Sept. 10, 2026) ("The protection of the information that we collect about visitors to the website or app is of the utmost importance to us and we take every reasonable measure to ensure that protection, including: We use commercially reasonable tools and techniques to protect against unauthorized access to our systems. We restrict access to private information to those who need such access in the course of their duties for us. We keep automatically collected data and voluntarily collected data separate at all times. We use internal encryption on all data stores that house voluntarily captured data.").

Information collected in connection with the services Defendant provides would be kept safe and confidential, and that Defendant would implement appropriate technical and organizational measures to protect the Private Information.

32. Plaintiffs and Class Members provided the Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

33. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

34. Plaintiffs and Class Members relied on the sophistication of Defendant to keep the Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information.

35. Plaintiffs and Class Members value the confidentiality of the Private Information and demand security to safeguard their Private Information.

36. Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep Plaintiffs' and Class Members' Private Information safe and confidential.

37. Defendant had obligations created by the FTC Act, HIPAA, contract, industry standards, and representations it made to keep the Private Information confidential and to protect it from unauthorized access and disclosure.

38. Defendant derived a substantial economic benefit from collecting Private Information from Plaintiffs and Class Members. Without the required submission of Private Information, Defendant could not perform the services it provides.

39. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

**B. *The Data Breach***

40. On January 22, 2026, it was publicly reported that Defendant suffered a major security incident in which a threat actor exfiltrated over 1.1 million patient records in December 2025 and subsequently offered the database for sale on a dark web forum. Reports indicate that a threat actor using the name "iProfessor" claimed responsibility for the listing on a dark web forum.[5]

41. Upon information and belief, according to public reports concerning the content of the Private Information posted on the dark web forum, and due to the nature of the services Defendant provides, the Private Information compromised in the Data Breach includes, but is not limited to, patients' names, contact information such as addresses, phone numbers, and email addresses, medical diagnoses, and prescription information.[6]

42. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

43. The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiffs and Class Members.

---

[5] *CallOnDoc Suffers Breach According to Dark Web Reports*, UPGUARD (Jan. 26, 2026), https://www.upguard.com/news/callondoc-data-breach-2026-01-22 (last visited Sept. 10, 2026).
[6] *Id.*

44. Upon information and belief, Plaintiffs' Private Information has been disseminated on the dark web, and Plaintiffs further believe that the Private Information of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**C. *Data Breaches Are Preventable***

45. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[7]

46. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

[7] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[8]

47. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

[8] *Id.* at 3-4.

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[9]

48. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information.

49. Given that Defendant was storing the sensitive Private Information of Plaintiffs and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

50. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and, upon information and belief, the exposure of the Private Information of Plaintiffs and Class Members.

---

[9] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Sept. 10, 2026).

**D. *Defendant Acquires, Collects, and Stores Sensitive Private Information***

51. As a condition of obtaining services from Defendant, Plaintiffs and Class Members were required to provide sensitive and confidential Private Information to Defendant.

52. Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for its collection of Plaintiffs' and Class Members' Private Information, Defendant would be unable to perform its services.

53. By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

54. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of the Private Information and relied on Defendant to keep the Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

55. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

56. Upon information and belief, and through its Privacy Policy, Defendant made promises and representations that it would maintain and protect the Private Information, demonstrating an understanding of the importance of securing Private Information.

**E. *Defendant Knew or Should Have Known of the Risk Because Entities in Possession of Private Information are Particularly Susceptible to Cyber Attacks***

57. Data thieves regularly target entities in possession of sensitive data like Defendant due to the highly sensitive information that they have in their custody.

58. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

59. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information, like Defendant, preceding the date of the breach.

60. In the third quarter of the 2023 fiscal year alone, 733 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[10]

61. In 2024, these numbers held steady—a record 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records (*i.e.*, a 211% increase year over year).[11] From 2018 until 2023, companies in the healthcare industry, such as Defendant, experienced the most data breaches among all measured industries.[12] In 2024, the healthcare industry was the second most targeted industry for data compromises behind only financial services.[13]

62. Additionally, in 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised—a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population.[14]

---

[10] *Q3 2023 Data Breach Report: Identity Theft Resource Center Reports Data Compromise Record with Three Months Left in the Ye*ar, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/post/q3-2023-data-breach-report-itrc-reports-data-compromise-record-with-three-months-left-in-year/ (last visited Sept. 10, 2026).
[11] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[12] *Id.*
[13] *Id.*
[14] Steve Alder, *The Biggest Healthcare Data Breaches of 2024*, HIPAA JOURNAL (Mar. 19, 2025), https://www.hipaajournal.com/biggest-healthcare-data-breaches-2024/ (last visited Sept. 10, 2026).

63. In light of recent high profile cybersecurity incidents at other companies in possession of Private Information, including, *e.g.*, American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020), 23andMe, Inc. (20 million records, October 2023), Change Healthcare Inc. (145 million records, February 2024), Kaiser Foundation Health Plan, Inc. (13 million records, April 2024), Ascension Health (5.6 million records, May 2024), HealthEquity, Inc. (4.3 million records, March 2024), and Acadian Ambulance Service, Inc. (2.8 million records, June 2024), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

64. As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

65. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

---

[15] Ben Kochman*, FBI, Secret Service Warn Of Targeted Ransomwa*re, LAW360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-

66. Additionally, as companies became more dependent on computer systems to run their business,[16] *e.g.*, working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[17]

67. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

68. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

69. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

70. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

---

targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited Sept. 10, 2026).

[16] Danny Brando, et al., *Implications of Cyber Risk for Financial Stabilit*y, FEDERAL RESERVE (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited Sept. 10, 2026).

[17] Dr. Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited Sept. 10, 2026).

71. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

72. As an entity in possession of Plaintiffs' and Class Members' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**F. *The Value of Private Information***

73. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

74. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

---

[18] 17 C.F.R. § 248.201 (2013).

[19] *Id.*

[20] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Sept. 10, 2026).

75. For example, Private Information can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

76. As a growing number of federal courts have begun to recognize, the loss of value of Private Information constitutes a viable damages theory. The sale of Private Information from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims—especially when it takes place on the dark web.

77. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[23] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[24] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

78. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand

---

[21] Ben Luthi, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Sept. 10, 2026).

[22] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 10, 2026).

[23] Louis DeNicola and Michelle Tipsword*, What Is the Dark We*b?, EXPERIAN (Jul. 16, 2026), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Sept. 10, 2026).

[24] *Id*.

requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth and other personal information.

79. Plaintiffs' and Class Members' Private Information is a valuable commodity, a market exists for Plaintiffs' and Class Members' Private Information (which is why the Data Breach was perpetrated in the first place), and Plaintiffs' and Class Members' Private Information is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves). As a result, Plaintiffs and Class Members have lost the value of their Private Information, which is sufficient to plausibly allege injury arising from a data breach.

80. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[25] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[26] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[27]

81. The Private Information potentially stolen in this specific Data Breach was particularly harmful.

82. Theft of PHI is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get

[25] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Sept. 10, 2026).
[26] *The personal data* revolution, DATACOUP, https://datacoup.com/ (last visited Sept. 10, 2026).
[27] *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Sept. 10, 2026).

other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[28]

83. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a significant amount of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

84. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[29] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[30] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[31]

---

[28] *Medical I.D. Theft*, EFRAUDPREVENTION, https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited Sept. 10, 2026).

[29] Adil Hussain Seh, et al., *Healthcare Data Breaches: Insights and Implications*, NATIONAL LIBRARY OF MEDICINE (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last visited Sept. 10, 2026).

[30] Steve Alder, *December 2019 Healthcare Data Breach Repo*rt, HIPAA JOURNAL (Jan. 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last visited Sept. 10, 2026).

[31] Rody Quinlan, *Healthcare Security: Ransomware Plays a Prominent Role in COVID-19 Era Breach*es, TENABLE (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last visited Sept. 10, 2026).

85. According to account monitoring company LogDog, medical data sells for $50 and up on the dark web.

86. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[32]

87. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[33] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[34]

88. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information likely compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

89. Private Information can be used to distinguish, identify, or trace an individual's identity. This can be accomplished alone, or in combination with other personal or identifying

[32] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER HEALTH NEWS (Feb. 7, 2014), https://khn.org/news/rise-of-identity-theft/ (last visited Sept. 10, 2026).
[33] Elinor Mills*, Study: Medical Identity Theft Is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Sept. 10, 2026).
[34] *Id.; see also Healthcare Data Breach: What to Know About Them and What to Do After O*ne, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Sept. 10, 2026).

information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[35]

90. Among other forms of fraud, using the Private Information, identity thieves may obtain driver's licenses, government benefits, and housing or even give false information to police.

91. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[36]

92. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**G. *Defendant Fails to Comply with FTC Guidelines***

93. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

94. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal information that they keep; properly dispose of personal

---

[35] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.
[36] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf.

information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[37]

95. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[38]

96. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

97. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect sensitive data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

98. These FTC enforcement actions include actions against entities in possession of Private Information, like Defendant. *See, e.g., In the Matter of LabMD, Inc., a corp.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission

---

[37] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sept. 10, 2026).
[38] *Id.*

concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

99. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

100. Defendant failed to properly implement basic data security practices.

101. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

102. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of Plaintiffs and Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class Members.

### H. *Defendant Fails to Comply with HIPAA Guidelines*

103. Defendant is covered under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security

Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

104. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[39] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

105. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

106. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

107. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

108. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

109. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

[39] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

110. HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

111. Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

112. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

113. HIPAA requires Defendant to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

114. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in

the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[40] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[41]

**I. *Defendant Fails to Comply with Industry Standards***

115. As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of Private Information which they collect and maintain.

116. Several best practices have been identified that, at a minimum, should be implemented by entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data.

[40] *Security Rule Guidance Material*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Sept. 10, 2026).

[41] *Guidance on Risk Analysis*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Sept. 10, 2026).

Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

117. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

118. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

119. These foregoing frameworks are existing and applicable industry standards, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### J. *Defendant Breached its Duty to Safeguard Plaintiffs' and Class Members' Private Information*

120. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in sharing, obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with

industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

121. Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect Plaintiffs' and Class Members' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to sufficiently train its employees regarding the proper handling of its Plaintiffs' and Class Members' Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA; and

f. Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

122. Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

123. Had Defendant remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class

Members' confidential Private Information.

**K. *Common Injuries and Damages***

124. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

**L. *The Data Breach Increases Victims' Risk of Identity Theft***

125. The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web, as that is the *modus operandi* of hackers.

126. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Simply, unauthorized individuals can easily access Plaintiffs' and Class Members' Private Information that Defendant stored and maintained.

127. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

128. Plaintiffs' and Class Members' Private Information that Defendant stored and maintained is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Class Members and to profit off their misfortune.

129. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[42]

130. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

---

[42] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e*.g., Brian Kreb*s, Medical Records for Sale in Underground Stolen From Texas Life Insurance F*irm, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited Sept. 10, 2026).

131. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

132. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like insurance information) of Plaintiffs and the other Class Members.

133. Thus, even if certain information (such as insurance information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

134. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**M. *Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

135. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual becomes aware that their Private Information was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

136. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions including, but not limited to: researching and verifying the

legitimacy of the Data Breach, contacting credit bureaus to place freezes, and changing passwords and resecuring their own computer networks.

137. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[43]

138. Plaintiffs' mitigation efforts are also consistent with the FTC's recommendations that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

139. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.

**N. *Diminution of Value of Private Information***

140. Private Information is a valuable property right.[45] Its value is axiomatic,

---

[43] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[44] *See IdentityTheft.*gov, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps.

[45] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

141. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[46]

142. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[47]

143. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[48,49] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[50]

144. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information that Defendant stored and maintained, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is

---

[46] *See, e.g.,* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[47] *S*ee Ashiq Ja*, Hackers Selling Healthcare Data in the Black Mark*et, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[48] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Sept. 10, 2026).

[49] *The personal data* revolution, DATACOUP, https://datacoup.com/ (last visited Sept. 10, 2026).

[50] *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Sept. 10, 2026).

now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

145. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

146. The fraudulent activity resulting from the Data Breach may not come to light for years.

147. Plaintiffs and Class Members now face years of constant surveillance of financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

148. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

149. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**O. *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

150. Given the type of targeted attack in this case, the sophisticated criminal activity, the sensitive type of Private Information involved in this Data Breach, and the Private Information already being disseminated on the dark web, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and

purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

151. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

152. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

153. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

**P. *Plaintiffs' Experiences***

***Plaintiff Armando Esquivel's Experience***

154. Plaintiff Esquivel was a patient who used Defendant's telehealth services.

155. As a condition of using Defendant's telehealth services, Plaintiff Esquivel's Private Information, including his name, address, phone number, email address, and credit card information, was provided to and processed through Defendant's systems.

156. Plaintiff Esquivel provided his Private Information to Defendant with the reasonable expectation that Defendant would protect and secure his Private Information from unauthorized access and disclosure.

157. Upon information and good-faith belief, Plaintiff Esquivel's Private Information—including his Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

158. Plaintiff Esquivel would not have used Defendant's telehealth services had he known that Defendant would fail to take reasonable steps to safeguard his Private Information.

159. Plaintiff Esquivel is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and he stores or destroys documents containing sensitive information in a safe and secure manner.

160. As a result of the Data Breach, Plaintiff Esquivel has made reasonable efforts to mitigate its impact, including researching the Data Breach and monitoring his accounts for suspicious activity, and has spent and will continue to spend significant time responding to the Data Breach that he otherwise would have spent on other activities.

161. Plaintiff Esquivel suffered actual injury from the exposure and/or theft of his Private Information as a result of the Data Breach, including: (a) entrusting his Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of his Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

162. Due to the Data Breach, Plaintiff Esquivel anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring his medical history, health insurance data, and financial accounts.

163. Knowing that unauthorized actors accessed and/or stole his Private Information has caused him anxiety, stress, and fear.

164. Plaintiff Esquivel is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being in unauthorized hands, and he has a continuing interest in ensuring that his Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff David Freifeld's Experience***

165. Plaintiff Freifeld was a patient who used Defendant's telehealth services.

166. As a condition of using Defendant's telehealth services, Plaintiff Freifeld's Private Information, including his name, address, phone number, email address, and credit card information, was provided to and processed through Defendant's systems.

167. Plaintiff Freifeld provided his Private Information to Defendant with the reasonable expectation that Defendant would protect and secure his Private Information from unauthorized access and disclosure.

168. Upon information and good-faith belief, Plaintiff Freifeld's Private Information—including his Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

169. Plaintiff Freifeld would not have used Defendant's telehealth services had he known that Defendant would fail to take reasonable steps to safeguard his Private Information.

170. Plaintiff Freifeld is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and he stores or destroys documents containing sensitive information in a safe and secure manner.

171. As a result of the Data Breach, Plaintiff Freifeld has made reasonable efforts to mitigate its impact, including researching the Data Breach and monitoring his accounts for suspicious activity, and has spent and will continue to spend significant time responding to the Data Breach that he otherwise would have spent on other activities.

172. Plaintiff Freifeld suffered actual injury from the exposure and/or theft of his Private Information as a result of the Data Breach, including: (a) entrusting his Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of his Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

173. Due to the Data Breach, Plaintiff Freifeld anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring his medical history, health insurance data, and financial accounts.

174. He has already experienced a sharp increase in spam calls, and knowing that unauthorized actors accessed and/or stole his Private Information has caused him anxiety, stress, and fear.

175. Plaintiff Freifeld is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being in unauthorized hands, and he has a continuing interest in ensuring that his Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Richard Jones's Experience***

176. Plaintiff Jones was a patient who used Defendant's telehealth services.

177. As a condition of using Defendant's telehealth services, Plaintiff Jones's Private Information, including his name, address, phone number, email address, credit card information, and Social Security number, was provided to and processed through Defendant's systems.

178. Plaintiff Jones provided his Private Information to Defendant with the reasonable expectation that Defendant would protect and secure his Private Information from unauthorized access and disclosure.

179. Upon information and good-faith belief, Plaintiff Jones's Private Information—including his Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

180. Plaintiff Jones would not have used Defendant's telehealth services had he known that Defendant would fail to take reasonable steps to safeguard his Private Information.

181. Plaintiff Jones is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and he stores or destroys documents containing sensitive information in a safe and secure manner.

182. As a result of the Data Breach, Plaintiff Jones has made reasonable efforts to mitigate its impact, including researching the Data Breach, contacting his credit card provider to change his credit card number, and monitoring his accounts for suspicious or fraudulent activity, and has spent and will continue to spend significant time responding to the Data Breach that he otherwise would have spent on other activities.

183. Plaintiff Jones suffered actual injury from the exposure and/or theft of his Private Information as a result of the Data Breach, including: (a) entrusting his Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of his Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

184. Plaintiff Jones has already experienced a sharp increase in phishing attempts seeking his bank information and a fraudulent charge attempt on his credit card account, indicating that his credit card information has likely been compromised and is circulating on the internet.

185. Due to the Data Breach, he anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring his medical history, health insurance data, and financial accounts.

186. Knowing that unauthorized actors accessed and/or stole his Private Information has caused him anxiety, stress, and fear.

187. Plaintiff Jones is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being in unauthorized hands, and he has a continuing interest in ensuring that his Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Yusha TrueLove's Experience***

188. Plaintiff TrueLove was a patient who used Defendant's telehealth services.

189. As a condition of using Defendant's telehealth services, Plaintiff TrueLove's Private Information, including his name, address, phone number, email address, and credit card information, was provided to and processed through Defendant's systems.

190. Plaintiff TrueLove provided his Private Information to Defendant with the reasonable expectation that Defendant would protect and secure his Private Information from unauthorized access and disclosure.

191. Upon information and good-faith belief, Plaintiff TrueLove's Private Information—including his Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

192. Plaintiff TrueLove would not have used Defendant's telehealth services had he known that Defendant would fail to take reasonable steps to safeguard his Private Information.

193. Plaintiff TrueLove is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and he stores or destroys documents containing sensitive information in a safe and secure manner.

194. As a result of the Data Breach, Plaintiff TrueLove has made reasonable efforts to mitigate its impact, including researching the Data Breach, contacting his credit card provider to change his credit card number, and monitoring his accounts for suspicious or fraudulent activity,

and has spent and will continue to spend significant time responding to the Data Breach that he otherwise would have spent on other activities.

195. Plaintiff TrueLove suffered actual injury from the exposure and/or theft of his Private Information as a result of the Data Breach, including: (a) entrusting his Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of his Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

196. Plaintiff TrueLove has already experienced a sharp increase in spam calls, texts, and phishing attempts and several fraudulent charge attempts on his credit card account, indicating that his credit card information has likely been compromised and is circulating on the internet.

197. Due to the Data Breach, he anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring his medical history, health insurance data, and financial accounts.

198. Knowing that unauthorized actors accessed and/or stole his Private Information has caused him anxiety, stress, and fear.

199. Plaintiff TrueLove is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being in unauthorized hands, and he has a continuing interest in ensuring that his Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Echo Wu's Experience***

200. Plaintiff Wu was a patient who used Defendant's telehealth services.

201. As a condition of using Defendant's telehealth services, Plaintiff Wu's Private Information, including her name, address, phone number, email address, and health symptoms, was provided to and processed through Defendant's systems.

202. Plaintiff Wu provided her Private Information to Defendant with the reasonable expectation that Defendant would protect and secure her Private Information from unauthorized access and disclosure.

203. Upon information and good-faith belief, Plaintiff Wu's Private Information—including her Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

204. Plaintiff Wu would not have used Defendant's telehealth services had she known that Defendant would fail to take reasonable steps to safeguard her Private Information.

205. Plaintiff Wu is very careful about sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and she stores or destroys documents containing sensitive information in a safe and secure manner.

206. As a result of the Data Breach, Plaintiff Wu has made reasonable efforts to mitigate its impact, including researching the Data Breach, monitoring her accounts for suspicious or fraudulent activity, and contacting her credit card company about suspicious activity, and has spent and will continue to spend significant time responding to the Data Breach that she otherwise would have spent on other activities.

207. Plaintiff Wu suffered actual injury from the exposure and/or theft of her Private Information as a result of the Data Breach, including: (a) entrusting her Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of her Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

208. Plaintiff Wu has already experienced a sharp increase in spam calls, texts, and phishing attempts.

209. Due to the Data Breach, she anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring her medical history, health insurance data, and financial accounts.

210. Knowing that unauthorized actors accessed and/or stole her Private Information has caused him anxiety, stress, and fear.

211. Plaintiff Wu is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being in unauthorized hands, and she has a continuing interest in ensuring that her Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Dawn Garrigues's Experience***

212. Plaintiff Garrigues was a patient who used Defendant's telehealth services.

213. As a condition of using Defendant's telehealth services, Plaintiff Garrigues's Private Information, including her name, date of birth, Social Security number, address, phone number, email address, health symptoms, medical information, financial information, and health insurance information was provided to and processed through Defendant's systems.

214. Plaintiff Garrigues provided her Private Information to Defendant with the reasonable expectation that Defendant would protect and secure her Private Information from unauthorized access and disclosure.

215. Upon information and good-faith belief, Plaintiff Garrigues's Private Information—including her Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

216. Plaintiff Garrigues would not have used Defendant's telehealth services had she known that Defendant would fail to take reasonable steps to safeguard her Private Information.

217. Plaintiff Garrigues is very careful about sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and she stores or destroys documents containing sensitive information in a safe and secure manner.

218. As a result of the Data Breach, Plaintiff Garrigues has made reasonable efforts to mitigate its impact, including spending approximately 9 hours researching the Data Breach, contacting her banks to get new card numbers, monitoring her accounts for suspicious or fraudulent activity, and contacting banks, credit card companies, and other vendors about fraudulent and suspicious activity. Moreover, she has spent and will continue to spend significant time responding to the Data Breach that she otherwise would have spent on other activities.

219. Plaintiff Garrigues suffered actual injury from the exposure and/or theft of her Private Information as a result of the Data Breach, including: (a) entrusting her Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and

diminution in the value of her Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

220. Plaintiff Garrigues has already experienced a sharp increase in spam calls, texts, and phishing attempts.

221. Since the Data Breach, Plaintiff Garrigues has experienced fraudulent charges on her debit card.

222. Due to the Data Breach, she anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring her medical history, health insurance data, and financial accounts.

223. Knowing that unauthorized actors accessed and/or stole her Private Information has caused her anxiety, stress, and fear.

224. Plaintiff Garrigues is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being in unauthorized hands, and she has a continuing interest in ensuring that her Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Brandy Zimmer's Experience***

225. Plaintiff Zimmer was a patient who used Defendant's telehealth services.

226. As a condition of using Defendant's telehealth services, Plaintiff Zimmer's Private Information, including her name, address, phone number, email address, and health symptoms, was provided to and processed through Defendant's systems.

227. Plaintiff Zimmer provided her Private Information to Defendant with the reasonable expectation that Defendant would protect and secure her Private Information from unauthorized access and disclosure.

228. Upon information and good-faith belief, Plaintiff Zimmer's Private Information—including her Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

229. Plaintiff Zimmer would not have used Defendant's telehealth services had she known that Defendant would fail to take reasonable steps to safeguard her Private Information.

230. Plaintiff Zimmer is very careful about sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and she stores or destroys documents containing sensitive information in a safe and secure manner.

231. As a result of the Data Breach, Plaintiff Zimmer has made reasonable efforts to mitigate its impact, including researching the Data Breach and monitoring her accounts for suspicious or fraudulent activity, and has spent and will continue to spend significant time responding to the Data Breach that she otherwise would have spent on other activities.

232. Plaintiff Zimmer suffered actual injury from the exposure and/or theft of her Private Information as a result of the Data Breach, including: (a) entrusting her Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of her Private Information—a form of intangible property; (c) loss of

privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

233. Plaintiff Zimmer has already experienced a sharp increase in spam calls, texts, and phishing attempts and a fraudulent charge attempt on her Uber account, indicating that her credit card information has likely been compromised and is circulating on the dark web.

234. Due to the Data Breach, she anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring her medical history, health insurance data, and financial accounts.

235. Knowing that unauthorized actors accessed and/or stole her Private Information has caused her anxiety, stress, and fear.

236. Plaintiff Zimmer is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being in unauthorized hands, and she has a continuing interest in ensuring that her Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Adam Bettencourt's Experience***

237. Plaintiff Bettencourt was a patient who used Defendant's telehealth services.

238. As a condition of using Defendant's telehealth services, Plaintiff Bettencourt's Private Information, including his name, address, phone number, email address, credit card information, and Social Security number, was provided to and processed through Defendant's systems.

239. Plaintiff Bettencourt provided his Private Information to Defendant with the reasonable expectation that Defendant would protect and secure his Private Information from unauthorized access and disclosure.

240. Upon information and good-faith belief, Plaintiff Bettencourt's Private Information—including his Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

241. Plaintiff Bettencourt would not have used Defendant's telehealth services had he known that Defendant would fail to take reasonable steps to safeguard his Private Information.

242. Plaintiff Bettencourt is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and he stores or destroys documents containing sensitive information in a safe and secure manner.

243. As a result of the Data Breach, Plaintiff Bettencourt has made reasonable efforts to mitigate its impact, including researching the Data Breach, contacting his credit and debit card provider to change his credit card number, and monitoring his accounts for suspicious or fraudulent activity, and has spent and will continue to spend significant time responding to the Data Breach that he otherwise would have spent on other activities.

244. Plaintiff Bettencourt suffered actual injury from the exposure and/or theft of his Private Information as a result of the Data Breach, including: (a) entrusting his Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of his Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

245. Plaintiff Bettencourt has already experienced a sharp increase in phishing attempts seeking his bank information and actual fraudulent charges on his credit and debit card accounts, indicating that his credit and debit card information has likely been compromised and is circulating on the internet.

246. Due to the Data Breach, he anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring his medical history, health insurance data, and financial accounts.

247. Knowing that unauthorized actors accessed and/or stole his Private Information has caused him anxiety, stress, and fear.

248. Plaintiff Bettencourt is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being in unauthorized hands, and he has a continuing interest in ensuring that his Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Armine Sarkissian' Experience***

249. Plaintiff Sarkissian was a patient who used Defendant's telehealth services.

250. As a condition of using Defendant's telehealth services, Plaintiff Sarkissian's Private Information, including her name, address, phone number, email address, and credit card information, was provided to and processed through Defendant's systems.

251. Plaintiff Sarkissian provided her Private Information to Defendant with the reasonable expectation that Defendant would protect and secure her Private Information from unauthorized access and disclosure.

252. Upon information and good-faith belief, Plaintiff Sarkissian's Private Information—including her Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

253. Plaintiff Sarkissian would not have used Defendant's telehealth services had she known that Defendant would fail to take reasonable steps to safeguard her Private Information.

254. Plaintiff Sarkissian is very careful about sharing her sensitive Private Information. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and she stores or destroys documents containing sensitive information in a safe and secure manner.

255. As a result of the Data Breach, Plaintiff Sarkissian has made reasonable efforts to mitigate its impact, including researching the Data Breach and monitoring her accounts for suspicious activity, and has spent and will continue to spend significant time responding to the Data Breach that she otherwise would have spent on other activities.

256. She has already experienced a sharp increase in spam calls and knowing that unauthorized actors accessed and/or stole her Private Information has caused her anxiety, stress, and fear.

257. Plaintiff Sarkissian suffered actual injury from the exposure and/or theft of her Private Information as a result of the Data Breach, including: (a) entrusting her Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of her Private Information—a form of intangible property; (c) loss of

privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

258. Due to the Data Breach, Plaintiff Sarkissian anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring her medical history, health insurance data, and financial accounts.

259. Knowing that unauthorized actors accessed and/or stole her Private Information has caused her anxiety, stress, and fear.

260. Plaintiff Sarkissian is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being in unauthorized hands, and she has a continuing interest in ensuring that her Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff John Sanders' Experience***

261. Plaintiff Sanders was a patient who used Defendant's telehealth services.

262. As a condition of using Defendant's telehealth services, Plaintiff Sanders' Private Information, including his name, address, phone number, email address, and credit card information, was provided to and processed through Defendant's systems.

263. Plaintiff Sanders provided his Private Information to Defendant with the reasonable expectation that Defendant would protect and secure his Private Information from unauthorized access and disclosure.

264. Upon information and good-faith belief, Plaintiff Sanders' Private Information—including his Patient Code, Transaction Number, name, address, city, state, ZIP code, country, phone number, email address, medical category, medical condition, and/or service/prescription

information—was improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

265. Plaintiff Sanders would not have used Defendant's telehealth services had he known that Defendant would fail to take reasonable steps to safeguard his Private Information.

266. Plaintiff Sanders is very careful about sharing his sensitive Private Information. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source, and he stores or destroys documents containing sensitive information in a safe and secure manner.

267. As a result of the Data Breach, Plaintiff Sanders has made reasonable efforts to mitigate its impact, including researching the Data Breach and monitoring his accounts for suspicious activity, and has spent and will continue to spend significant time responding to the Data Breach that he otherwise would have spent on other activities.

268. He has already experienced a sharp increase in spam calls, and knowing that unauthorized actors accessed and/or stole his Private Information has caused him anxiety, stress, and fear.

269. Plaintiff Sanders suffered actual injury from the exposure and/or theft of his Private Information as a result of the Data Breach, including: (a) entrusting his Private Information to Defendant under the mistaken belief that adequate data security was in place; (b) damage to and diminution in the value of his Private Information—a form of intangible property; (c) loss of privacy; (d) continuous, imminent, and impending risk of financial, medical, and identity fraud and theft; and (e) the time and expense of mitigation efforts.

270. Due to the Data Breach, Plaintiff Sanders anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring his medical history, health insurance data, and financial accounts.

271. Knowing that unauthorized actors accessed and/or stole his Private Information has caused him anxiety, stress, and fear.

272. Plaintiff Sanders is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being in unauthorized hands, and he has a continuing interest in ensuring that his Private Information, which upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

273. Pursuant to Rule 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and on behalf of all members of the following proposed classes:

> **Nationwide Class**: All individuals residing in the United States whose Private Information was compromised in the Call-On-Doc Data Breach discovered in January 2026, including all those individuals who received notice of the Data Breach.
>
> **California Subclass**: All individuals residing in California whose Private Information was compromised in the Call-On-Doc Data Breach discovered in January 2026, including all those individuals who received notice of the Data Breach.

Collectively, the Nationwide Class and the California Subclass are referred to as the "Class," and the individuals in the Class are referred to as "Class Members."

274. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their staff and immediate family members.

275. Plaintiffs reserve the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

276. Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

277. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. The number of individuals affected has not been publicly disclosed at this time; however, upon information and belief, a significant number of individuals are affected by the Data Breach based upon reports that 1.1 million patient records potentially related to this Data Breach were subsequently offered on a database for sale on a dark web forum.[51]

278. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual members of the Class are the following:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

[51] *CallOnDoc Suffers Breach According to Dark Web Repor*ts, UPGUARD (Jan. 26, 2026), https://www.upguard.com/news/callondoc-data-breach-2026-01-22 (last visited Sept. 10, 2026).

c. Whether Defendant had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and,

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

279. Typicality: Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach and the same alleged violations by Defendant.

280. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members

uniformly and Plaintiffs' challenges of these policies hinge on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

281. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

282. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

283. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the

costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

284. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

285. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

286. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members and Defendant may continue to act unlawfully as set forth in this Complaint.

287. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

288. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendant failed to take commercially reasonable steps to safeguard Class Members' Private Information; and

e. Whether adherence to FTC and HIPAA data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of the Nationwide Class)**

289. Plaintiffs incorporate by reference paragraphs 1-288 above as if fully set forth herein.

290. Plaintiffs and Class Members entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use it for business purposes only, and not disclose it to unauthorized third parties.

291. Defendant owed a duty of care to Plaintiffs and Class Members that is independent of any contract. Because Defendant chose to solicit, collect, and store the Private Information of Plaintiffs and Class Members, it assumed a common-law duty to exercise reasonable care to safeguard that information against a foreseeable data breach. It was foreseeable that Defendant's failure to use adequate data security in accordance with industry standards would result in the compromise of Plaintiffs' and Class Members' Private Information, and that foreseeable danger came to pass.

292. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could suffer if their Private Information was wrongfully disclosed.

293. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. Defendant actively sought and obtained Plaintiffs' and Class Members' Private Information.

294. Defendant owed to Plaintiffs and Class Members at least the following duties: (a) to exercise reasonable care in handling and using the Private Information in its care and custody; (b) to implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access; (c) to promptly detect attempts at unauthorized access; and (d) to notify Plaintiffs and Class Members within a reasonable time of any breach of the security of their Private Information.

295. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach, so that Plaintiffs and Class Members could take appropriate measures to protect their Private Information, be vigilant in the face of an increased risk of harm, and take other necessary steps to mitigate the harm caused by the Data Breach.

296. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

297. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class

involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

298. Defendant's duty to use reasonable security measures also arose from the special value and sensitivity of the Private Information entrusted to it as a necessary part of obtaining Defendant's services, and from Defendant's superior knowledge of, and control over, the means of protecting that information.

299. The applicable standard of care is informed by, among other sources, Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45; the Health Insurance Portability and Accountability Act ("HIPAA"), 45 C.F.R. Parts 160 and 164; and prevailing data-security industry standards. Defendant's failure to comply with these standards is evidence of its breach of the duty of reasonable care. Plaintiffs do not assert negligence *per se* and instead rely on these standards solely as evidence of the applicable duty and standard of care.

300. Defendant knew or reasonably should have known that its failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and Class Members involved an unreasonable risk of harm to Plaintiffs and Class Members, even where the harm occurred through the criminal acts of a third party, because that criminal conduct was a foreseeable result of Defendant's inadequate security.

301. Similarly, and as described *infra*, Defendant violated its duties under the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq*. (the "CCPA"), the Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq*. (the "CMIA"), the California Customer Records Act, Cal. Civ. Code § 1798.80, *et seq*. (the "CRA"), and other state data security laws which constitute negligence.

302. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information —whether by malware or otherwise.

303. Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and Class Members and the importance of exercising reasonable care in handling it.

304. Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

305. Defendant breached these duties as evidenced by the Data Breach.

306. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

307. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

308. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

309. Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

310. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

311. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

312. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

313. Plaintiffs incorporate by reference paragraphs 1-312 above as if fully set forth herein.

314. Plaintiffs and Class Members were required to provide their Private Information to Defendant as a condition of receiving services provided by Defendant. Plaintiffs and Class Members provided their Private Information to Defendant or its third-party agents in exchange for Defendant's services.

315. Plaintiffs and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures, and that Defendant would use adequate cybersecurity measures to protect the Private Information they were required to provide, based on Defendant's duties under state and federal law, its Privacy Policy, and its internal policies.

316. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

317. Plaintiffs and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant or its third-party agents in exchange for services.

318. In turn, and through internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

319. In its Privacy Policy, Defendant represented that it had a legal duty to protect Plaintiffs' and Class Members' Private Information.

320. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

321. After all, Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

322. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

323. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

324. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty. Defendant materially breached the contracts it entered with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

325. In these and other ways, Defendant violated its duty of good faith and fair dealing.

326. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

327. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

328. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

329. Plaintiffs incorporate by reference paragraphs 1-328 above as if fully set forth herein.

330. This claim is pleaded in the alternative to the breach of implied contract claim.

331. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their Private Information to provide services, and (2) accepting payment.

332. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

333. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

334. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

335. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures.

Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

336. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) Private Information and (2) payment because Defendant failed to adequately protect their Private Information.

337. Plaintiffs and Class Members have no adequate remedy at law.

338. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## FOURTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

339. Plaintiffs incorporate by reference paragraphs 1-338 above as if fully set forth herein.

340. Given the relationship between Defendant and Plaintiffs and Class Members, where Defendant became guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

341. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their Private Information.

342. Because of the highly sensitive nature of the Private Information, Plaintiffs and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their Private Information had they known the reality of Defendant's inadequate data security practices.

343. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' Private Information.

344. Defendant also breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

345. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**FIFTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

346. Plaintiffs incorporate by reference paragraphs 1-345 above as if fully set forth herein.

347. Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

348. Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq.* (the "CCPA"), the Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq.* (the "CMIA"), the California Customer Records Act, Cal. Civ. Code § 1798.80, *et seq.* (the "CRA"), and other state data security laws.

349. Defendant stored the Private Information of Plaintiffs and the California Subclass in its computer systems and knew or should have known it did not employ reasonable, industry-standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiffs' and the California Subclass's Private Information secure to prevent the loss or misuse of that Private Information.

350. Defendant failed to disclose to Plaintiffs and the California Subclass that their Private Information was not secure. However, Plaintiffs and the California Subclass were entitled to assume, and did assume, that Defendant had secured their Private Information. At no time were Plaintiffs and the California Subclass on notice that their Private Information was not secure, which Defendant had a duty to disclose.

351. Defendant also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and the California Subclass's nonencrypted and nonredacted Private Information.

352. Had Defendant complied with these requirements, Plaintiffs and the California Subclass would not have suffered the damages related to the data breach.

353. Defendant's conduct was unlawful, in that it violated the CCPA.

354. Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

355. Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

356. Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct

includes employing unreasonable and inadequate data security despite its business model of actively collecting Private Information.

357. Defendant also engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

358. Instead, Defendant made the Private Information of Plaintiffs and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiffs and the California Subclass to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

359. As a result of those unlawful and unfair business practices, Plaintiffs and the California Subclass suffered an injury-in-fact and have lost money or property.

360. For one, on information and belief, Plaintiffs' and the California Subclass's stolen Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

361. The injuries to Plaintiffs and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

362. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

363. Therefore, Plaintiffs and the California Subclass are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

**SIXTH CAUSE OF ACTION**
**Violations of the California Consumer Privacy Act ("CCPA")**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiffs and the California Subclass)**

364. Plaintiffs incorporate by reference paragraphs 1-363 above as if fully set forth herein.

365. Upon information and belief Defendant violated the CCPA by providing notice on or around September 18, 2026—whereas the CCPA requires disclosure "within 30 calendar days of discovery or notification of the data breach." Cal. Civ. Code § 1798.82(a)(2)(A).

366. Defendant violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted Private Information of Plaintiffs and the California Subclass. As a direct and proximate result, Plaintiffs' and the California Subclass's nonencrypted and nonredacted Private Information was subject to unauthorized access and exfiltration, theft, or disclosure.

367. Defendant is a "business" under the meaning of Civil Code § 1798.140 because Defendant is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civ. Code § 1798.140(d).

368. Plaintiffs and California Subclass Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Private Information, including Plaintiffs' and California Subclass Members' Private Information. Plaintiffs and California Subclass Members have an interest in ensuring that their Private Information is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

369. Pursuant to California Civil Code § 1798.150(b), CCPA notice letters have been sent to Defendant's registered service agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. If Defendant cannot cure within 30 days—and Plaintiffs believe such cure is not possible under these facts and circumstances—then Plaintiffs intend to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

370. As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

371. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

**<u>SEVENTH CAUSE OF ACTION</u>**
**Violation of the California Customer Records Act**
**Cal. Civ. Code § 1798.80, *et seq*.**
**(On Behalf of Plaintiffs and the California Subclass)**

372. Plaintiffs incorporate by reference paragraphs 1-371 above as if fully set forth herein.

373. Under the California Customer Records Act, any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" must "disclose any breach of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82. The disclosure must "be made in the most expedient time possible and without unreasonable delay" but disclosure must occur "immediately following discovery [of the breach], if the personal information was, ***or*** is reasonably believed to have been, acquired by an unauthorized person." *Id* (emphasis added).

374. The Data Breach constitutes a "breach of the security system" of Defendant.

375. An unauthorized person acquired the personal, unencrypted information of Plaintiffs and the California Subclass.

376. Defendant knew that an unauthorized person had acquired the personal, unencrypted information of Plaintiffs and the California Subclass but waited approximately nine (9) months to notify them. Given the severity of the Data Breach, nine months was an unreasonable delay.

377. Defendant's unreasonable delay prevented Plaintiffs and the Class from taking appropriate measures to protect themselves against harm.

378. Because Plaintiffs and the California Subclass were unable to protect themselves, they suffered incrementally increased damages that they would not have suffered with timelier notice.

379. Plaintiffs and the California Subclass are entitled to equitable relief and damages in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**Violation of the Confidentiality of Medical Information Act**
**Cal. Civ. Code §§ 56, *et seq*.**
**(On Behalf of Plaintiffs and the California Sublass)**

380. Plaintiffs incorporate by reference paragraphs 1-379 above as if fully set forth herein.

381. Under California's Confidentiality of Medical Information Act ("CMIA"), "persons receiving health care services have a right to expect that the confidentiality of individual identifiable medical information derived by health service providers be reasonably preserved . . . [and it] is the intention of the Legislature in enacting this act, to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information. Cal Civ Code Div. 1, Pt. 2.6.

382. Furthermore, "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein." Cal Civ Code § 56.101(a).

383. And "[a]ny provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided[.]" Cal Civ Code § 56.101(a).

384. Thus, "an individual may bring an action against a person or entity who has negligently released confidential information or records concerning him or her[.]" Cal Civ Code § 56.36(b).

385. Here, Defendant is subject to the CMIA because Defendant is a provider of health care. And Defendant created, maintained, preserved, stored, abandoned, destroyed, and/or disposed of medical information regarding Plaintiffs and the California Subclass.

386. But Defendant was negligent because it failed to take reasonable precautions to ensure its data systems were protected. As a result of Defendant's negligence, an unauthorized third-party viewed and obtained the medical information of Plaintiffs and the California Subclass.

387. As such, Defendant is therefore liable for damages in an amount to be determined at trial, but not less than the statutorily provided nominal damages of $1,000 for each class member.

**NINTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

388. Plaintiffs incorporate by reference paragraphs 1-387 above as if fully set forth herein.

389. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

390. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege/alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And

Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

391. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

392. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

393. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

394. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

395. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

396. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying the Class and the California Subclass, as defined herein, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information Plaintiffs and Class Members provided to it;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

    iii. requiring Defendant to delete, destroy, and purge the Private Information Plaintiffs and Class Members provided to it unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information Plaintiffs and Class Members provided to it;

v. prohibiting Defendant from maintaining the Private Information Plaintiffs and Class Members provided to it on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as

well as protecting the Private Information Plaintiffs and Class Members provided to it;

xi. requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For a declaratory judgment as set forth in the Ninth Cause of Action;

E. For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined, including statutory damages under Cal. Civ. Code § 1798.150 and nominal damages under Cal. Civ. Code § 56.36(b) on behalf of the California Subclass;

F. For restitution and disgorgement of all monies and profits Defendant wrongfully acquired or retained as a result of its unlawful and unfair business practices, including as available under Cal. Bus. & Prof. Code § 17200, et seq.;

G. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

H. For prejudgment and post-judgment interest on all amounts awarded; and

I. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: September 21, 2026

Respectfully Submitted,

*/s/ Gerald D. Wells, III*
Gerald D. Wells, III (*pro hac vice*)
**LYNCH CARPENTER, LLP**
1760 Market Street, Suite 600
Philadelphia, PA 19103
Telephone: (267) 609-6910
Facsimile: (267) 609-6955
Email: jerry@lcllp.com

*Interim Class Counsel*

Christian Levis*
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
Email: clevis@lowey.com

Israel David*
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, NY 10004
Telephone: (212) 350-8850
Email: israel.david@davidllc.com

Leanna A. Loginov
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Telephone: (305) 479-2299
Email: lloginov@shamisgentile.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
Email: raina@straussborrelli.com

Britany A. Kabakov*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave.
Chicago, IL 60614
Telephone: (708) 437-6476
Email: britany@almeidalawgroup.com

Melissa G. Meyer*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mmeyer@zlk.com

Beena M. McDonald*
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
One Haverford Centre
361 Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Email: bmm@chimicles.com

William B. Federman*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
The Village, OK 73120
Telephone: (405) 235-1560
Email: WBF@Federmanlaw.com

*Plaintiffs' Executive Committee*

* *pro hac vice forthcoming*